Now we will approach the podium, and I invite Judge Chen to make an appropriate motion. Thank you, Judge Newman. Good morning. I move the admission of Tanya Mano, who is a member of the Bar and is in good standing with the highest courts of California and the District of Columbia. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. I know all these things because Ms. Mano has been serving as one of my clerks for the past year, and from the very beginning she has been an outstanding clerk in every way. She's really been so helpful in her service to the court and helping me from not making mistakes while at the same time just showing how she is a high caliber person and attorney as well as someone with great character. I respectfully request that the court grant my motion. Thank you. The panel will vote on the motion. Do you have a vote, Judge Shaw? I've considered all the supporting papers, and I've heard what Judge Chen has to say, and I support his motion. And I, too. So, Ms. Mano, will you approach the clerk for administering the oath? Thank you, and welcome to the Bar, Ms. Mano. We look forward to your arguments in the future. We shall proceed with the arguments scheduled for this morning. The first argued case is number 18-17-74, Winterton, against the MSPB. Mr. Islam. Good morning. My name is Mukman Islam. Before I wanted to do a brief explanation, I know the opposing counsel mentioned some concerns of a waiver in the Federal Rules of Appellate Procedure 28. I just wanted to identify that for the most part, I believe that all of the information and arguments that will be presented today are clearly cited in the brief petitioner. There were some conclusionary arguments or summation of facts that may not have been explicitly cited, too, but they were concluded in the exhibit and attached addendum to the brief, as well as the appendix. And if there are any aspects of that, I can flush that out today. With that being said, this is a case, in my opinion, which is a complete issue of the ruling of law. The hearing the board in this decision, I felt as though in the evidentiary aspect did address a lot of the accurate facts. The problem was when they applied the Furov test in regards to totality of the circumstances, it was applied inappropriately according to the law. In this case is a simple case, not simple case, but it's a case of an air traffic controller who had over a 15-year career with the Department of Transportation, FAA. In that regard, since September of 2015, he had a new manager. And from that period on, from September of 2015 until August of 2015, you had numerous incidents occurring at this Napa Tower, which caused him and other air traffic controllers to make numerous complaints against the manager. And then eventually at one point, it was investigated by the Office of Inspector General. And it's very important to understand that when they were investigated by the Office of Inspector General, it then turned it to a completely different situation. Because now, anything that they say, anything could be subject to criminal prosecution. So this was a big deal for him. One thing, the A.J. had an exhaustive opinion here. She did. Looked at all the issues, made credibility determinations. And I realize you say that you have legal arguments, but what do you say about the factual determinations that the administrative judge made? Because I would be surprised if your legal arguments would be able to withstand those factual determinations. Where did the judge go wrong on the facts in your view? She went wrong in the third element of the Furov test. So basically, she, in my opinion, she identified that this was a serious issue. And Mr. Winterton, due to his health and the stress that was occurring at the workplace. What issue did you say she went wrong on? On a third aspect, saying that there was no improper actions by the agency. So in a coercion test, in order to establish it, she has to, I believe she identified that even in an objective standard, Mr. Winterton did have significant health issues that was accumulated based upon the stress of the work. And because of that, that's why he resigned. And he had no, generally speaking, he didn't have a free choice. But where she went wrong was she alleged that there was no improper actions by the agency. And my opinion is that if you look at the facts, there are numerous things that occurred throughout this process that was improper by the agency that she did not consider. For example, or at least she found on the opposite side of the law. For example, the initial accountability board that was done in September of 2015 or October 2015, this accountability board was supposed to be a sexual harassment allegation by one air traffic controller. There were 10 or at least seven of the air traffic controllers brought into investigation about things that were not relevant. And you also have to remember that my client was the air traffic controller union representative at the time. So he was serving in capacity of working with management and with the air traffic controllers and heard all of these complaints. And he made numerous complaints over a two or three month process and they went unfounded. Secondly, I think she went wrong in that she ignored the fact that he was threatened by the union representative who was working at this time, in my opinion, closely with the management and the evidence of that. Are you referring to the testimony in the record to the effect that two representatives of the union network, Mr. Winterton, and then said sort of toned things down a bit? Pretty much. And it's not just toned things down, but they literally said if the complaints are, if they don't stop the complaints, then they, mind you, he never was complaining this time. He was complaining on behalf of other people. But if they don't say air traffic controllers don't stop the complaints, he could be removed from position. Now, the reason why that's important is because shortly before that, you also remember Mr. McCoy, who was that part of the, one of those union officials, he met with Mr. Tom DiBernardo, who was the district manager, and talked to him and said they're lying or there was some discussion about that. That's the second thing that I think that the judge missed, just missed. The last thing is, if you look at- So you're saying there was an error on the part of the administrative judge in not looking at these other complaints that were being made? The lack of investigating those complaints. It's one thing if the complaints occur and they investigate it, then I would agree with you that it is no error. But the issue is that when these investigations or complaints go on for a period of time and there's no investigation into them, there's no, quote unquote, thoroughness of determining if these complaints have any seriousness, then that becomes to be coercion. The last aspect is the OIG investigation. Here's why that's really important. The timeline of that just does not add up. So for example, the hearing this, I think the Ministry of Law Judge's biggest error. She relies on Mr. Tom DiBernardo's statement where he says that it was a security investigation, which is not the criminal side. It's just simply agency- Is this the investigation that arose out of the alleged work slowdown? Yes, alleged work stoppage. But here's what's interesting, right? So first you have the security investigation allegedly come in and they're supposed to investigate the complaints that were sent to the administrative court. So the administrator of the agency of FAA receives a complaint by all of the majority of the air traffic controllers at Napa Tau, receives this complaint. His district management tells the individuals, Tom DiBernardo as well as the air traffic control manager at the facility, we are going to investigate the complaints of the air traffic controllers. We are not looking at work stoppage. That's where there's a specific directive. Then a month or two months later, there is an investigation coming by where only two witnesses are interviewed. And the only two witnesses are the air traffic control manager, who was the one who was being complained against, and the lady who, the other air traffic controller who made the allegation that she overheard the collusion of them alleging this work stoppage. And this is where, again, I think the administrative judge made a complete detour of the error law, is that she relies on this information as fact, but the problem is that they were aware- What information did she rely on as fact? That the, I'm sorry, let me back that up for a second. So the argument put forth by the agency is that Tom DiBernardo states that when the investigation comes out to look into the air traffic controller's complaints, they find out about this alleged work stoppage, and they refer it to the Office of Inspector General. That's the timeline that they propose. But that's not accurate to the facts that were presented to her, nor in the record. So for example, what's error is that the agency, because Ms. Sandra Holcomb sends an email to everyone on April 7th, telling everyone that, hey, there is this person who has this information, she's willing to tell anyone, because this can't go on. So they already know as of April 2016, that there's someone who alleges that there could have been a work stoppage. They're aware of this. But yet, on top, despite that, the April 12th email from the director or the executive in the district office tells them, we're not looking at a work stoppage. So how does the Ministry of Law and Justice justify that in June, roughly, there is now an OIG investigation, which is now a criminal investigation based upon an information that was presented to the Ashland Security Investigation, which the agency already was aware of. Not only was the agency aware of it, Ms. Holcomb was aware of it, Mr. Tom DiBernardo was aware, everyone was already aware as of April that this occurred. And the Ministry of Law and Justice didn't address that at all. That's a significant issue. You're saying the gap between the initial awareness of the facts and the implementation of the investigation? That's an issue. But the bigger issue is that they were aware of it in April, but they allege that in June, the disclosure of this information justified the OIG investigation. That just does not add up. Because if you have a situation where they're aware in April and told, do not look into this, told this is not an issue, then when the investigation starts in June, there's no way that the Ashland Security, which is a part of the FAA, which is under Administrative Corridor, which is under the... What I'm trying to understand is, are you saying if there's information that management learns that there was some kind of work stoppage among all the air traffic controllers in the Napa Valley Airport, that if they learn about it in April... Because it is a criminal act if there is some conspiracy of all the ATCs to not show up to work. I would agree with you, Judge Shannon. I'm not saying that they're not allowed to delay the investigation. What I am saying is you can't use that the disclosure of it in June justified the point of them doing the OIG investigation, because they were aware of it as early as April. So if you're aware of this in April... I guess I don't understand why it's an improper agency action to decide to do an OIG investigation in June of 2016. Because you have the administrators or the district offices telling them, we're not looking into this. We're going to look into the ATCs' complaint. And then on the same timeline, you have Mr. Tom DiBernardo, as well as Ms. Holcomb, pressing for a security investigation, looking into the work stoppage. They're told not to do it. Then you come down two months later, and only two people are interviewed, and one of them is Ms. Holcomb. None of the ATCs were interviewed. So what I'm arguing is that this is misrepresentation, or at least deception, because in the investigation, they were supposed to look at the ATCs' complaint. They didn't even do that. Instead, they only interviewed the two people who was associated with the knowledge of the work stoppage. And then immediately the OIG began the investigation. I believe I asked for that. Thank you. May it please the court. After holding a three-day hearing, an MSTB administrative judge issued a 35-page initial decision that analyzed the evidence and Mr. Winterton's various allegations and arguments. She properly concluded that Mr. Winterton failed to prove that his retirement was involuntary. In so finding, she considered all of the actions that Mr. Winterton is now alleging that she failed to consider, including the questions asked during the 2015 investigation into the allegations of sexual harassment by JAH. Could you just respond to what your opposing counsel was arguing? Sure. Instead of running through the brief. Well, specifically, with the OIG investigation, if you look at page 28 of the initial decision, she did consider the argument that Mr. Winterton raised there, that there was a problem with the timing of the OIG investigation and the fact that it was originally Ron Fincher had determined that the work stoppage would not be included as part of the ASH investigation. However, she went through the timeline of events. She recognized that when Ms. Holcomb and AC were interviewed by ASH personnel in April or May of 2015, they discussed the fact that they believed there was a work stoppage. She found that it was not improper for them to tell ASH this. And then what they did, ASH officials who had no relationship with anyone at the Napa facility decided that the ASH investigation should be suspended while the work stoppage was investigated by the IG and that's in fact what happened. The IG investigation began in June. After the IG investigation was concluded in August, it was determined that the ASH investigation would resume and the evidence of record shows that it did, although Mr. Winterton didn't choose to put anything on at his hearing before the MSPB administrative judge about what the outcome of that investigation was. But the timeline... Do you know what the outcome was? I don't know what the outcome was and neither did Mr. DiBernardo at hearing also did not know what the outcome was, but I represent the MSPB. The agency may know, but there was nothing put on before the MSPB that spoke to what the outcome was. Is there a reason why the ASH investigation couldn't go on at the same time as the OIG investigation? I'm not aware of one. Again, I represent the MSPB, but it was it was asked to determine that they would suspend that investigation until the OIG investigation was concluded. That was the security personnel's determination and why they made that determination. I don't know. But isn't the outcome significant, highly significant, to whether or not this precautionary action of resignation was justified? In what sense? I'm sorry, I don't understand the outcome of the ASH investigation, but Mr. Winterton has the burden of showing that there was an improper agency action. And so if he believes that something was improper as the result of the ASH investigation, then it was his job to find that out through discovery and put something on to that effect at hearing. The MSPB has no independent knowledge of what happened as a result of the security investigation. In addition, with respect to Mr. Winterton's argument about union representatives telling him to cut back on the complaints, there is no evidence in the record that management had any involvement with that union decision. It is true that the union said he needed to learn to work with Ms. Holcomb, or they would replace him for some labor management relations purposes. However, no evidence was deduced that that was at the request of management or that management had any control of the union's decision in that regard. Finally, with regard to citations to the record in the brief, there are certain things that were cited in the brief that are simply inaccurate that were presented as facts, such as the allegation that there were multiple searches through the tower cabin and air traffic controller's belongings. There's no evidence in the record to that effect. And in fact, the AHA considered the one instance where Ms. Holcomb came across someone's belongings and found that she did so accidentally while looking for training papers and only looked at them to the degree necessary to determine that they were not what she was looking for and how they should be removed. Also, the assertion that ATC zero events were a common occurrence is not supported by anything that I'm aware of in the record. So it's not merely a nitpicky issue of citation, it's the fact that some of these things that are claimed are simply inaccurate. Are there any other questions that I can answer for you at the MSPB? No. Any questions? Any more questions for Ms. Holcomb? Thank you. Mr. Yale. Yeah, please, the court. I guess one point we would like to address would be the OIG investigation. You know, I think the board specifically addressed this, and I think a point that should be brought up is statement on appendix page 28, that given the information available for the FAA at that time, I mean, it really would have been negligence if the security individuals were provided information about this work stoppage and it wasn't actually investigated. I mean, this is clearly a serious matter. We have a situation where this facility planes are having to land, you know, basically without air traffic control, you know, guidance, land at their own risk. And so we really think that that was, you know, the most serious allegation that was made there. And the board addressed that. It addressed the timing, it addressed how the interviews were conducted. And we really think that substantial evidence certainly supports that. You know, we think that's sort of a theme that's throughout petitioner's brief about allegations that were raised that were purportedly not addressed by the board, and they actually were. And so we think that certainly substantial evidence supports the questions. We're certainly here to answer those, but otherwise we would request that the court affirm the judgment of the board. A number of the ATCs filed EEO complaints. Do you know the status of those? We don't. I don't. I think there was, I think there was, with regards to one of them in the record, there was evidence presented about a settlement that was made. But with regards to the other ones, I mean, there was nothing other than the fact that those were made by a number of air traffic controllers. There was nothing in the record as to the end result of those. And so, and I don't have sort of independent knowledge of whether any of those were sustained. Neither of you seems to know or to be able to report what seems to be going to the heart of the question of whether or not the resignation was justified. Well, I think we would respectfully disagree with that. I mean, we have a situation where we had a were, were testified. We have numerous allegations of complaints, EEO complaints, various complaints, just to management. The board did a pretty exhaustive... They're not before us for decision? Well, I mean, those, with regards to the, as the board judge put it, with regards to, for example, the allegations that in the Swanson investigation that management was asking improper questions. You know, those, those issues were addressed by the board in exhaustive detail. I mean, there were allegations that questions, inappropriate questions were asked. And the board went through and determined as to sort of the proprietary, propriety of that investigation that Mr. Winterton didn't prove by a preponderance of the evidence that there was any wrongdoing here. And that sort of, I mean, I think we have to keep in mind that the burden of proof here, you know, there was initial burden of proof with regards to whether or not a hearing would be granted. And that's based on allegations in an involuntary retirement case. And that the board, the board judge found that that was met. And so there was a hearing. I mean, there was plenty of opportunity in this three-day hearing with all of these to conduct discovery as to a determination of, you know, for example, the end outcome of some of these investigations. But we think that the board judge certainly addressed these in detail. The propriety of the OIG investigation, for example, we, we specifically addressed. Any more questions? Thank you. Thank you, Mr. Yeo. Mr. Eastman. I can be brief. A few things I just wanted to say that there's this testimony or information that relied upon by the hearing officer, the administrative law judge. And it is on page, appendix page 29. The clear thing is that it's a talk about the ash referring to OIG. But there is no documentation provided. There is no information or testimony provided that when that was provided, how that was provided. It's just Mr. DiBernardo recounting that's what he recalls. Secondly is Holcomb signs her affidavit on June. The exact date of her signing her affidavit was on August 1st, 2016. That's the date that she signed her affidavit of testifying under the ash investigation. Well, the OIG investigation was notified to all of the, to the department in June of 2016. So the question here is what was going on? And that's the problem that we have to look at. We have to look at the reality of the circumstances to look at how Mr. Winterton and other air traffic controllers, there were about three resonations after the OIG investigation based upon the threat of criminal action. So the reality is, and then Mr. Winterton had a health problem regarding his diabetes and high blood pressure, which succumbed him to essentially have to take lorazepam, which was something that revoked his medical clearance. So you have all of these things going on. And when we look at what's improper, we have to look at the fact that the air traffic controllers letter of April 7th, there was never not one air traffic controller other than Ms. Carter interviewed regarding their complaints. Mr. Winterton gets noticed in August that he's about to go in front of a criminal investigation. He's already under this high blood pressure. He already has a diabetes. He's taking lorazepam for anxiety and he puts in his resonation four days before he's scheduled to go do the interview. So this is not a situation where he, he planned this out or he thought this out and it was premeditated. If you look at the eight months starting from September, 15 year employee, more than 15, I don't have exact numbers, I would say 15 plus years. He starts in September. He complains, he complains regarding the one you asked about the, uh, EEO complaints. Actually, I'm representing one of the EEO complaints. Now we are scheduled for him in front of a ministry law judge regarding that action. Another person, the person who was terminated in March of 2019, there was a settlement and he was brought back. So Mr. Winterton is seeing all of this. He's a union representative negotiating or trying to work with management. He was actually removed in that capacity because of these complaints. And then now he gets a criminal investigation based on information that was presented to the, the, the, the FAA in, in, in April of 2016. Then their allegation or their story is that in June, it was disclosed. And I just want to make this last point. If we're talking about the, uh, uh, the, the, the disclosure in June, I do agree that independent of anything, Ash could have had a reason to investigate this matter. But if Ash is under the FAA, under the same department, then they were under the same instruction not to investigate the work stoppage. And if they were there under that instruction, there's no way that this is new information to them. There's no way that this information is now justifying an OIG investigation. That's my only point, not the time delay. But the point is that that's what the basis and that's where I think the administrative law just missed significantly. Because she realized just looking at the time delay, if you look at her statement, there's no way in there she says, she just explains why someone who knew something in April was told to come out and investigate and not look at it, finds out about the same thing in June and then looks at it and refers it out. That, that's not, that's not addressed at all. And that is an error of law. Because if that's true that this was not, they were told not to do it and they still did it anyway, then that would be an improper action. Any other questions? I'm sorry. Thank you. Thank you all. The case is taken under submission.